**Shelley OPP, an individual, Plaintiff,**

v.

**WHEATON VAN LINES, INC., d/b/a Wheaton World Wide Moving, an Indiana corporation, and Soraghan Moving and Storage, Inc., an Illinois corporation, Defendants.**

**No. 97 C 7781.**

United States District Court,
N.D. Illinois,
Eastern Division.

July 12, 1999.

2. Travelers' exhibits indicate that this page was copied from the 1998 handbook.

Gregory J. Abbott, Chicago, IL, representing plaintiff.

Robert Ostojic of Leahy, Eisenberg & Fraenkel, Chicago, IL, representing defendants.

## MEMORANDUM OPINION AND ORDER

KEYS, United States Magistrate Judge.

Before the Court are Plaintiff's and Defendants' respective Motions for Summary Judgment on Count I of the Amended Complaint. Also before the Court is the Motion for Summary Judgment of Defendant Soraghan Moving and Storage, Inc. ("Soraghan") as to Count II of the Amended Complaint. For the following reasons, this Court grants the Defendants' Motion and denies the Plaintiff's Motion as to Count I,[1] and grants Soraghan's Motion as to Count II.

## FACTS

### I. The Parties

Plaintiff Shelley Opp is an individual currently residing in Tinley Park, Illinois. (Pl.'s 12(M) ¶ 1.) Ms. Opp had lived with her husband, Richard Opp, in Anaheim Hills, California from 1992 through August of 1996. (Defs.' Mem.Supp.Mot.Summ.J. ["Defs.' Mem.Supp."], Ex. B, Deposition of Plaintiff ["Pl.'s Dep."] at 8.) In October of 1996, Ms. Opp moved to Tinley Park, Illinois. (Pl.'s Dep. at 9.)

---

**1.** Since Plaintiff and Defendants raise the same issues in their cross-motions, this Court will initially consider only Defendant's Motions, and, therefore, construe all the facts in the light most favorable to the Plaintiff.

Defendant Wheaton Van Lines ("Wheaton") is a foreign corporation with offices in Indianapolis, Indiana. (Pl.'s 12(M) ¶ 2.) Defendant Soraghan is an Illinois corporation and an agent of Wheaton, doing business in Tinley Park, Illinois. (Pl.'s 12(M) ¶ 3.)

## II. *The Dispute*

In August of 1996, Mr. and Ms. Opp had agreed to seek a divorce when she left the Anaheim Hills house ("the House") that they previously shared. (Pl.'s Dep. at 8–9.) Though she did not live there at any point after that date, many of her belongings were still in the House. (Pl.'s Dep. at 9–10.) When the House was sold in June of 1997, Ms. Opp decided to move her personal property to her residence in Illinois. (Pl.'s Dep. at 10.) She contacted Soraghan through her brother, Greg Grant, an employee of Soraghan, and specified the items she wished to move. (Pl.'s Dep. at 12–13.) Mr. Grant gave a list of the items to Linda Kloempken, another Soraghan employee. (Pl.'s Dep. at 13.) Ms. Kloempken then contacted Ms. Opp via telephone and gave her an estimate of the moving charges. (Pl.'s Dep. at 14–15.) Ms. Kloempken also filled out an "Estimate/Order for Service" and sent it to Ms. Opp via fax. (Pl.'s Dep. at 15.) Ms. Opp did not sign the Estimate/Order for Service. (Pl.'s Dep. at 20.)

Subsequently, Ms. Opp revised the list of the items she wanted to have moved, and sent that list to Ms. Kloempken via fax, and Ms. Kloempken sent Ms. Opp a revised estimate of the moving charges and a revised Estimate/Order for Service form. (Pl.'s Dep. at 16, 18.) Ms. Opp did not sign the revised form. (Pl.'s Dep. at 20.) Ms. Kloempken then told Ms. Opp via telephone that it would·be necessary for an agent in California to do a "walk-through" of the House in order to inspect the property to be moved. (Pl.'s Dep. at 18.) At that time, Ms. Kloempken and Ms. Opp discussed declaring the value of her property for insurance purposes, and Ms. Opp indicated that she would want to insure the property for $10,000. (Pl.'s Dep. at 19–20.)

Ms. Kloempken told Ms. Opp that someone would need to be present at the House when the walk-through happened. (Pl.'s Dep. at 32.) Ms. Opp told Mr. Opp about the walk-through and asked him to be present when the walk-through took place, and also told him that an agent of Wheaton would contact him directly. (Pl.'s Dep. at 32.) An agent of Wheaton then came to the House, examined the boxes that were to be moved, and made some notes.[2] (Pl.'s Dep. at 35.)

Ms. Kloempken then faxed a new Estimate/Order for Service·to Ms. Opp, who signed it. (Pl.'s Dep. at 20.) In the space marked "Shipper Intends to Declare a Valuation of" on the signed copy were the handwritten words "Shipper to Advise ($10,000 Full Replacement 85, 65, 45)." (Pl.'s Mot.Summ.J., Ex. A.) Ms. Kloempken says that she told Ms. Opp that the valuation of the property for insurance purposes had to occur at the time of shipment. (Defs.' Reply Supp.Mot.Summ.J. ["Defs.' Reply Supp."], Ex. 3, Affidavit of Linda Kloempken ["Kloempken Aff."] ¶ 7.) Ms. Opp subsequently spoke with Pamela Comparin, an·employee of Soraghan, who asked her to send a check to Soraghan. (Pl.'s Dep. at 42.) Ms. Opp then called Mr. Opp and asked him to make her property available to the movers for transport. (Pl.'s Dep. at 43–44.)

On July 1, 1997, an agent of Wheaton called Ms. Opp from California to inform her that the moving van had a flat tire, but that it would be repaired and that the van would then pick up her belongings. (Pl.'s Dep. at 44.) Ms. Opp then called Mr. Opp at his office and asked him to go to the

---

**2.** Mr. Opp did not speak to Ms. Opp about the walk-through until after the goods were shipped. (Pl.'s Dep. at 35–36.)

House to unlock the door for the movers. (Pl.'s Dep. at 45.) When the movers arrived at the House, Mr. Opp signed a bill of lading authorizing Wheaton to accept Ms. Opp's belongings for transport. (Defs.' 12(M) ¶ 9; Defs.' Mem.Supp., Ex. A.) There was a space on the form marked "Carrier Liability," and below those words was the following:

UNLESS THE SHIPPER EXPRESSLY RELEASES THE SHIPMENT TO A VALUE OF 60 CENTS PER POUND PER ARTICLE, THE CARRIER'S MAXIMUM LIABILITY FOR LOSS AND DAMAGE SHALL BE EITHER THE LUMP SUM VALUE DECLARED BY THE SHIPPER OR AN AMOUNT EQUAL TO $1.25 FOR EACH POUND OF WEIGHT IN THE SHIPMENT, WHICHEVER IS GREATER. The shipment will move subject to the rules and conditions of the carrier's tariff. Shipper hereby releases the entire shipment to a value not exceeding[:]

(Defs.' Mem.Supp., Ex. A.) Below those words was a line, under which were the words "(TO BE COMPLETED BY THE PERSON SIGNING BELOW.)" (Defs.' Mem.Supp., Ex. A.) On the line was handwritten "¢ .60/lb". (Defs.' Mem.Supp., Ex. A.) Underneath were the following words:

NOTICE: THE SHIPPER SIGNING THE CONTRACT MUST INSERT IN THE SPACE ABOVE, IN HIS OWN HANDWRITING, EITHER HIS DECLARATION OF THE ACTUAL VALUE OF THE SHIPMENT, OR THE WORDS "60 cents per pound per article," OTHERWISE THE SHIPMENT WILL BE DEEMED RELEASED TO A MAXIMUM VALUE EQUAL TO $1.25 TIMES THE WEIGHT OF THE SHIPMENT IN POUNDS.

(Defs.' Mem.Supp., Ex. A.) Below this was a line with Mr. Opp's signature on it, dated "7/1/97." (Defs.' Mem.Supp., Ex. A; Pl.'s Dep. at 59–60.) Underneath the line with Mr. Opp's signature were the words "SHIPPER or LAWFUL REPRESEN-TATIVE." (Defs.' Mem.Supp., Ex. A.) Below this was a section for "REPLACEMENT VALUE PROTECTION," with spaces to declare a deductible and the value of the goods, and another space for a signature; none of those spaces were filled in. (Defs.' Mem.Supp., Ex. A.) Ms. Opp alleges that Mr. Opp told her that the van driver informed him that he was required to release the property at ¢.60 per pound. (Pl.'s Dep. at 60.) Ms. Opp also alleges that Mr. Opp told her that he cannot remember whether he wrote "¢.60/lb" on the bill of lading. (Pl.'s Dep. at 61.) Mr. Opp also signed the bill of lading on two separate pages. (Defs.' Mem.Supp., Ex. A; Pl.'s Dep. at 62.) Mr. Opp subsequently called Ms. Opp and informed her that the pickup was complete. (Pl.'s Dep. at 50–51.) Ms. Opp's property was weighed in Colton, California, at the House Grain Company, and the weight was 1,700 pounds. (Defs.' 12(M) ¶ 11; Defs.' Reply Supp., Ex. 2.)

On July 8, 1997, Ms. Comparin called Ms. Opp, told her that her property was in transit, and asked her to bring a check to Soraghan's office. (Pl.'s Dep. at 47.) Ms. Opp brought a cashier's check to the office that same day and gave it to Ms. Comparin. (Pl.'s Dep. at 48–49.) Ms. Opp had paid a fee to obtain the cashier's check from Heritage Bank. (Pl.'s 12(N) for Count II/Soraghan's Mot.Summ.J. ¶ 8.) On or about that same date, the truck carrying Ms. Opp's belongings was struck by a train, damaging much of her property. (Pl.'s 12(M) ¶¶ 15, 18.) Ms. Comparin notified Ms. Opp about the damage on July 14, and Ms. Opp inspected her property at Soraghan's Tinley Park office the next day. (Pl.'s Dep. at 50, 56.) Ms. Comparin returned Ms. Opp's check to her on July 15. (Pl.'s Dep. at 49.)

When Ms. Opp inspected her property on July 15, she made a list of the items that had been damaged or destroyed. (Pl.'s 12(M) ¶ 18.) She estimates the full replacement value of those items as $8,165.00. (Pl.'s 12(M) ¶ 20.) Other items

were present when Ms. Opp inspected her property on July 15, but could not be found in early October of 1997, when Ms. Opp returned to Soraghan's office. (Pl.'s 12(M) ¶ 22; Pl.'s Dep. at 67.) Ms. Opp estimates the full replacement value of those missing goods as $1,035.00. (Pl.'s 12(M) ¶ 23.) There were three other boxes that Ms. Opp had not seen since the accident (lost either during or after the accident), and Ms. Opp estimates the full replacement value of those items as $1,614.50. (Pl.'s 12(M) ¶¶ 24, 25.) The full replacement value for all of Ms. Opp's losses is, by her own calculation, $10,-814.50. (Pl.'s 12(M) ¶ 27.)

On September 17, 1997, George Carlisle, Director of Consumer Affairs for Wheaton, sent a letter to Ms. Opp stating that her recovery for her property damage would be limited to a value of $1.25 per pound shipped. (Pl.'s 12(N) ¶ 18.) On November 6, 1997, Ms. Opp filed her Complaint. On December 23, 1997, Wheaton sent a check in the amount of $2,625.00 to Ms. Opp.[3] (Defs.' 12(M) ¶ 14.) Ms. Opp neither cashed the check nor returned it to Wheaton. (Defs.' 12(M) ¶ 15.) Ms. Opp filed her Amended Complaint on May 22, 1998: Count I alleges property damage against both Defendants; and Count II alleges fraud against Defendant Soraghan alone. Currently before the are the cross summary judgment motions of the parties as to Count I, and Soraghan's motion for summary judgment as to Count II.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is required if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R.Civ.P. 56(e). A genuine issue of material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liber-*

ty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The substantive law determines what is material: "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* The movant bears the initial burden of showing that there is no genuine issue of material fact; if the movant meets that burden, the burden shifts to the non-movant to show, through specific facts in the record, that there is " 'a genuine issue for trial.' " *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Rule 56(e)). The non-movant must show evidence sufficient to support each element of the case. *Id.* at 322, 106 S.Ct. 2548. The court must, however, construe all facts in the light most favorable to the non-movant, and may not weigh credibility questions or draw inferences from the facts. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

### II. Count I—Property Damage

The Carmack Amendment, 49 U.S.C. § 14706, to the Interstate Commerce Act, 49 U.S.C. § 10101 et. seq., provides for the liability of interstate carriers for damage to the goods transported. *Capitol Converting Equip., Inc. v. LEP Transp., Inc.,* 965 F.2d 391, 394 (7th Cir. 1992). The Carmack Amendment makes motor carriers who transport goods liable for the "actual loss or injury to the property ...." 49 U.S.C. 14706(a). To establish a prima facie case for damages under the Amendment, a plaintiff must show that "(i) the goods in question had been delivered to the carrier in good condition; (ii) the goods had arrived at the final destination in a damaged or diminished condition; and (iii) the damages can be specified." *Pharma Bio, Inc. v. TNT Holland Motor Express, Inc.,* 102 F.3d 914, 916 (7th Cir. 1996). If a plaintiff makes a prima facie

---

3. The check, tendered in an attempt to settle the matter, appears to be for an amount equal to the replacement value of Ms. Opp's property if the property were insured at $1.25 per pound, plus an extra $500 thrown in for good measure.

case, a defendant can escape liability only by showing that the damage was attributable to " '(a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority, (e) or the inherent vice or nature of the goods.' " *Id.* (quoting *Missouri Pacific R.R. Co. v. Elmore & Stahl*, 377 U.S. 134, 137, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964)).

Defendants do not deny that they are motor carriers within the meaning of the Carmack Amendment. Nor do they deny the existence of a contract between themselves and Ms. Opp to transport her property from California to Illinois. (Defs.' 12(M) ¶ 2.) Nor do they dispute that the goods were initially in good condition, that they were damaged in transit, or that the damage can be specified. (Pl.'s 12(M) ¶¶ 7, 16, 19; Defs.' 12(N) ¶¶ 7, 16, 1.) They *do not contend* that the damage was caused by forces beyond their control, as specified in *Missouri Pacific.* Accordingly, the sole issue for this Court to decide is the amount of damages.

The Carmack Amendment provides that a carrier may limit its liability through a written agreement with the shipper "if that value would be reasonable under the circumstances surrounding the transportation." 49 U.S.C. 14706(c)(1)(A). Defendants contend that their liability to Ms. Opp is limited to $1,020.00—60 cents per pound shipped—under the written agreement allegedly signed by Mr. Opp when Wheaton picked up Ms. Opp's property. (Defs.' Mem.Supp. at 2.) Defendants must show, therefore, that the agreement is valid, and that liability in the amount of $1,020.00 is reasonable under the circumstances.[4]

4. This Court, in ruling on a motion for summary judgment, does not ordinarily make a decision on damages. The Seventh Amendment allows a judge to set damages, however, when a "plaintiff is entitled to a particular amount of damages as a matter of law...." *McKinnon v. City of Berwyn*, 750 F.2d 1383, 1392 (7th Cir.1984). In this case, Ms. Opp's damages turn on a question of law, namely

### A. Validity of the Agreement

■ To limit its liability under the Carmack Amendment, a carrier must do the following:

(1) maintain a tariff within the prescribed guidelines of the Interstate Commerce Commission; (2) obtain the shipper's agreement as to his choice of liability; (3) give the shipper a reasonable opportunity to choose between two or more levels of liability; and (4) issue a receipt or bill of lading prior to moving the shipment.

*Hughes v. United Van Lines, Inc.*, 829 F.2d 1407, 1415 (7th Cir.1987). This Court reviews each factor in turn.

#### 1. *Maintaining a Tariff*

■ Defendants have attached a copy of the tariff, that they maintain, to the Memorandum in Support of Motion for Summary Judgment, and have also attached a supporting affidavit, signed by George Carlisle, to their Reply in Support of Motion for Summary Judgment. (Defs.' Mem.Supp., Ex. E; Defs.' Reply Supp. Mot.Summ.J. ["Defs.' Reply"], Ex. 2.) This Court is satisfied that the affidavit authenticates the tariff, and that Defendants had filed the tariff with the Interstate Commerce Commission at the time Ms. Opp's goods were shipped. Defendants, therefore, maintained a tariff as required by the *Hughes* test.

#### 2. *Obtaining the Shipper's Agreement*

■ Ms. Opp contends that Defendants did not obtain her agreement to the limitation of liability, since Mr. Opp apparently signed the bill of lading and wrote "¢.60/lb" on it in the space set aside for the limitation of the carrier's liability, without consulting Ms. Opp about that limitation,[5]

whether Defendants successfully limited their liability, and this Court will, therefore, rule on the question of damages insofar as it relates to that matter of law.

5. Another question, not raised in the pleadings, is whether the terms of the bill of lading are satisfied by the notation "¢.60/lb," since the instructions call for the words "60 cents

(Pl.'s Resp. at 8–9, 11–12.) If Mr. Opp was Ms. Opp's agent, however, Defendants did obtain the shipper's agreement; this Court must, therefore, decide whether there was an agency relationship between Ms. Opp and Mr. Opp, and what the scope of the relationship was.[6]

### a. *Existence of an Agency Relationship*

Under Illinois law, there is a two-part test for determining whether a principal-agent relationship exists: the principal must have the " 'right to control the manner and method in which work is carried out by the alleged agent,' " and the agent must be able to " 'affect the legal relationships of the principal.' " *Chemtool, Inc. v. Lubrication Techs., Inc.*, 148 F.3d 742, 745 (7th Cir.1998) (quoting *Anderson v. Boy Scouts of Am., Inc.*, 226 Ill.App.3d 440, 168 Ill.Dec. 492, 589 N.E.2d 892, 894 (1993)).

It is clear that Ms. Opp had a right to control the "manner and method" of Mr. Opp's actions insofar as they related to the shipment of her property. Since only Ms. Opp's property was being moved, she had complete authority over its disposition. (Pl.'s Dep. at 11.) Moreover, she had the right to deny to Mr. Opp any part in moving the shipment; no part of the move hinged on his consent. Since she had the power to keep him from participating in the move, she had the power to limit his involvement, and therefore, she could control the manner and method in which he did his "work" on the move. It is also clear that Mr. Opp was in a position to affect Ms. Opp's legal relationships, in that

per pound per article." The letter of September 17, 1997, from Mr. Carlisle to Ms. Opp, indicates that Mr. Carlisle believed at that time that Mr. Opp had not successfully limited Defendants' liability to 60 cents per pound, and that they were liable, therefore, at a rate of $1.25 per pound. The meaning of "¢.60/lb" is clear to this Court, however, and it signifies the same limitation as "60 cents per pound per article."

The doctrine of "substantial compliance" or "substantial performance" dictates that "when a party performs the essential, material parts of a contract in good faith," even if literal compliance with the terms is lacking, the other party may be bound. *Hardin, Rodriguez & Boivin Anesthesiologists, Ltd. v. Paradigm Ins. Co.*, 962 F.2d 628, 636 (7th Cir. 1992). A more recent case observed that "[i]n contract law, substantial compliance with contract duties is often compliance enough." *Employers Ins. of Wausau v. Browner*, 52 F.3d 656, 664 (7th Cir.1995). This Court finds that the notation "¢.60/lb" constituted substantial compliance with the terms of the bill of lading.

Ms. Opp contends that Defendants are barred from arguing that their liability was limited to 60 cents per pound, since Mr. Carlisle's letter to her (and the check that Wheaton subsequently sent to her) suggest that Defendants believed they were liable for the $1.25 per pound prescribed as the default liability amount in the bill of lading. (Pl.'s Resp.Defs.' Mot.Summ.J. ["Pl.'s Resp."], at 14; Pl.'s Resp., Ex. A, Attach. 2; Defs.' Mem. Supp., Ex. D.) But there is no reason why Defendants should be bound by Mr. Carlisle's

initial conclusion regarding liability; a legal conclusion by a corporation's Director of Consumer Affairs does not preclude the corporation from pursuing a different legal argument, nor does it necessarily indicate that the argument is made in bad faith. Defendants' initial assumption that they were liable at $1.25 per pound does not, therefore, preclude them from now arguing that their liability should instead be limited to 60 cents per pound.

6. It is not clear whether actions arising from the Carmack Amendment are governed by the federal common law of agency, or by the state common law. Other federally created causes of action are governed by the federal common law; *see Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 457, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957) (holding that federal courts must fashion a body of federal law to govern LMRA suits); *Moriarty v. Glueckert Funeral Home, Ltd.*, 155 F.3d 859, 866 n. 15 (7th Cir.1998) (noting that actions arising under ERISA look to the federal common law of agency). No case has explicitly applied that reasoning to the Carmack Amendment, however, and absent clear direction to the contrary, this Court will apply Illinois common law. Since federal and Illinois laws of agency both recognize that an agent's authority can be actual or apparent, it makes little difference in this case. *See, e.g., Moriarty*, 155 F.3d at 866; *Simpson v. Compagnie Nationale Air France*, 42 Ill.2d 496, 248 N.E.2d 117, 120 (1969); *Faber–Musser Co. v. William E. Dee Clay Mfg. Co.*, 291 Ill. 240, 126 N.E. 186, 188 (1920).

Defendants' liability to Ms. Opp hinged on Mr. Opp's decisions. This Court finds, therefore, that an agency relationship existed between Mr. and Ms. Opp.

#### b. *Scope of the Agency Relationship*

This Court must also decide whether Mr. Opp's actions were within the scope of his authority as an agent. An agent can have either actual or apparent authority. *Moriarty,* 155 F.3d at 865–66. To have actual authority, an agent must reasonably believe that the principal has authorized him or her to act in a certain way. *Moriarty,* 155 F.3d at 866. An agent has apparent authority when a third person reasonably believes that the principal has authorized the agent to act for him or her. *Id.*

Though there is no testimony from Mr. Opp in the record, it appears to this Court that he believed he was authorized to limit the Defendants' liability, and that such a belief was reasonable. Ms. Opp concedes that she asked Mr. Opp to assist the movers by opening the door and giving them the property to be moved. (Pl.'s Dep. at 44–45.) She acknowledges that Mr. Opp admitted signing the bill of lading that the movers gave him. (Pl.'s Dep. at 59–60.) Since Mr. Opp signed the bill of lading in the space for the "authorized agent," it appears that he believed he was authorized to act on Ms. Opp's behalf when he agreed to a limitation of the carrier's liability. (Defs.' Mem.Supp., Ex. A.) Moreover, since Ms. Opp had authorized him to supervise a "walk-through" and give the movers access to the property, it was reasonable for him to believe that his authority extended to the contractual agreement as well. (Pl.'s Dep. at 32.)

Even if Mr. Opp did not have actual authority to limit the Defendants' liability on Ms. Opp's behalf, he did have apparent authority, since the Defendants could reasonably believe he was acting for Ms. Opp. Mr. Opp was present, at Ms. Opp's request, for both the "walk-through" and the actual pick-up of the goods, and no one else was there. Mr. Opp's presence at the home, his possession of keys to the home, and his authority to tender the goods to the Defendants all tended to create the impression that he was an authorized agent.

Ms. Opp contends that her failure to designate Mr. Opp, or anyone else, as her agent on the Estimate/Order for Service shows that he was not her agent, and that Defendants were aware of that. (Pl.'s Resp. at 12–13.) The import of this argument is, presumably, that Mr. Opp had no apparent authority. But apparent authority can be conferred through unofficial as well as official acts; "[i]t is the authority which a reasonably prudent person, exercising diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess." *Gilbert v. Sycamore Mun. Hosp.,* 156 Ill.2d 511, 190 Ill.Dec. 758, 622 N.E.2d 788, 795 (1993). Ms. Opp's "conduct" includes not only her initial failure to designate an agent on the Estimate/Order for Service, but also her request that Mr. Opp assist the movers by supervising the walk-through and allowing them access to the property. The latter event happened after Ms. Opp signed the Estimate/Order for Service, and could give a reasonable person the impression that Ms. Opp had decided to have Mr. Opp act as her agent after all. (Pl.'s Dep. at 37, 43–44.) This Court, therefore, rejects Ms. Opp's argument that her failure to specifically designate Mr. Opp as her agent precludes a finding of agency.

Furthermore, in Illinois, a principal is bound by the actions of an agent when those actions are " 'reasonably necessary to the effective execution of [the agent's] express authority.' " *Advance Mortgage Corp. v. Concordia Mut. Life Ass'n,* 135 Ill.App.3d 477, 90 Ill.Dec. 225, 481 N.E.2d 1025, 1029 (1985) (quoting 2A C.J.S. Agency § 154 (1972)). Ms. Opp was aware, or should have been aware, that Mr. Opp would need to advise the movers

about a limitation of the Defendants' liability, since the Estimate/Order for Service that she signed included, in the space set aside for the carrier's liability, the words "Shipper to Advise."[7] (Pl.'s Mot.Summ.J., Ex. A.) As Ms. Opp did not intend to be present when her property was picked up, and as there was no other obvious opportunity to make a representation to Defendants about a limitation of liability, it was necessary for Mr. Opp to make that decision to do what Ms. Opp authorized him to do—i.e., assist the movers in picking up Ms. Opp's property. (Pl.'s Dep. at 43.)

Since Mr. Opp had both actual and apparent authority to act as the agent of Ms. Opp, and since Mr. Opp agreed to the limitation of Defendants' liability in that capacity, Defendants have shown that the shipper agreed to the limitation. Defendants have, therefore, satisfied the second part of the Hughes test.

### 3. *Reasonable Opportunity to Choose*

■ Under the third part of the *Hughes* test, Defendants must show that the shipper had a reasonable opportunity to choose between two or more levels of liability. As Mr. Opp was an authorized agent of Ms. Opp, and as he chose to limit the Defendants' liability, the question turns on whether he had a choice in that action. The bill of lading that Mr. Opp signed gives the shipper the option of de-

claring the actual value of the shipment or limiting the defendants' liability to $.60/lb; if the shipper wrote nothing under the words "Carrier Liability," according to the bill of lading, the goods would be valued at $1.25/lb. Mr. Opp accordingly had three options, and he had a reasonable opportunity to choose among them.

■ Ms. Opp contends that Mr. Opp told her that he does not remember writing "¢.60/lb" on the bill of lading, and that the van driver told him that he was required to release the property at that value. (Pl.'s Dep. at 60–61.) Those statements are hearsay and inadmissible for their truth, however, and are therefore not properly considered on a motion for summary judgment.[8] Even assuming, *arguendo*, that the statements are admissible, they do not show that Mr. Opp had no opportunity to choose between different levels of liability. Ms. Opp acknowledges, in her deposition, that Mr. Opp signed the bill of lading, and the bill of lading clearly sets out how the shipper may choose between different levels of liability. (Pl.'s Dep. at 59–60; Defs.' Mem.Supp., Ex. A.) If someone else had written "¢ .60/lb" on the bill of lading after Mr. Opp's signature, the addition would be obvious, since his copy would not include that notation. Therefore, whether or not Mr. Opp wrote "¢.60/lb" on the bill of lading himself, he

---

7. Ms. Kloempken contends that she told Ms. Opp via telephone that the shipper must declare the carrier's liability for the property on the bill of lading, though Ms. Opp denies that Ms. Kloempken told her that. This Court must construe all facts in the light most favorable to Ms. Opp, however, even so doing, the "shipper to advise" language on the Estimate/Order for Service makes it clear that the question of Defendants' liability was not sealed and that either Ms. Opp or someone acting on her behalf would, at some future point, have to agree officially to a certain rate. As Ms. Opp clearly never did that, the burden fell to Mr. Opp, and it is unreasonable for Ms. Opp to suggest that she could not have anticipated that.

The Estimate/Order for Service also includes the words "($10,000 Full Replacement

85, 65, 45)." This Court reads the reference to the dollar value as an indication that Ms. Opp had stated the full value of her property as $10,000, not that she had committed herself to that level of liability. As for the numbers "85, 65, 45," there is no explanation of these numbers anywhere in the record. This Court will, therefore, assume that the notation has no bearing on the case.

8. Hearsay, in summary judgment pleadings, is inadmissible "to the same extent that it is inadmissible at trial." *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir.1997). Evidence other than "depositions, answers to interrogatories, admissions and affidavits . . . . must be identified by affidavit or otherwise made admissible in evidence." *Martz v. Union Labor Life Ins. Co.*, 757 F.2d 135, 138 (7th Cir.1985).

and Ms. Opp are responsible for the terms of the contract he signed. Accordingly, the third part of the *Hughes* test is satisfied.

### 4. *Issuance of a Receipt or Bill of Lading*

This Court has already found that Mr. Opp was the authorized agent of Ms. Opp, and it is undisputed that Defendants gave Mr. Opp a bill of lading before moving the shipment. Defendants have therefore satisfied the fourth part of the *Hughes* test.

### B. **Reasonable Limitation on Liability**

 The Seventh Circuit has never addressed what factors are relevant to determining whether a limitation on liability is "reasonable under the circumstances," as required by the Carmack Amendment. Other circuits' treatment of the question, however, suggests that a limitation on liability should be invalidated only in the event of "intentional destruction or conduct in the nature of theft of the property" by the carrier, since the shipper can buy higher levels of protection. *American Cyanamid Co. v. New Penn Motor Express, Inc.*, 979 F.2d 310, 315–16 (3d Cir. 1992). The Eighth Circuit upheld a liability limitation even when there was evidence of willful deviation from the contract, citing a California case which held (in summary) that, "in absence of fraud, willful misconduct ... does not vitiate" a liability agreement. *Rocky Ford Moving Vans, Inc. v. United States*, 501 F.2d 1369, 1372–73 (8th Cir.1974). This Court is persuaded that a liability limitation should be enforced in the absence of fraud or intentional misconduct, and as there is no evidence of such behavior in this instance, the limitation is reasonable.

### III. *Count II—Fraud*

 In Count II of the Amended Complaint at Law, Ms. Opp alleges fraud on the part of Defendant Soraghan, in that a Soraghan employee allegedly contacted Ms. Opp after the accident and requested full payment. (Amended Complaint at 3–4.) Soraghan has moved for summary judgment on this claim.

Soraghan alleges that Ms. Opp has not shown that anyone at Soraghan knew about the accident when she was contacted. (Soraghan Reply Supp.Mot.Summ.J. as to Count II ["Soraghan Reply"] at 3.) Furthermore, Soraghan has attached an affidavit of the employee—Ms. Comparin—who telephoned Ms. Opp on July 8, 1999, seeking payment. That affidavit plainly states that "[o]n July 8, 1997, [Ms. Comparin] did not know that the truck carrying Ms. Opp's belongings was struck by a train." (Soraghan Reply at Ex. A, ¶ 3.) Thus, even when the facts are construed in the light most favorable to her, Ms. Opp simply fails to raise a genuine issue of fact on this Count.

### *CONCLUSION*

For the foregoing reasons, there is no genuine issue of material fact with respect to Count I of Plaintiff's Complaint, and Defendants are entitled to summary judgment and a limitation of liability to $1,020. Additionally, there is no genuine issue of material fact on Count II of the Amended Complaint, and Defendant Soraghan is entitled to summary judgment on that claim, as well.

**IT IS THEREFORE ORDERED** that:

Summary Judgment be, and the same hereby is, **GRANTED** in favor of Defendants Wheaton and Soraghan, and against Plaintiff Shelley Opp, on Count I of the Amended Complaint.

**IT IS FURTHER ORDERED** that:

Summary Judgment be, and the same hereby is, **GRANTED** in favor of Defendant Soraghan, and against Plaintiff Shelley Opp, on Count II of the Amended Complaint.