SECOND DIVISION
FILED: April 20, 2010

No. 1-09-1126

| | | |
|---|---|---|
| 1350 LAKE SHORE ASSOCIATES, an Illinois limited partnership, | ) ) ) | APPEAL FROM THE CIRCUIT COURT OF COOK COUNTY. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | |
| ARNOLD L. RANDALL, Commissioner, Department of Planning and Development of the City of Chicago, and the CITY OF CHICAGO, an Illinois municipal corporation, | ) ) ) ) ) ) | No. 07 CH 16368 |
| Defendants-Appellees, | ) ) ) | |
| and | ) ) | |
| EDWARD T. JOYCE, CARL HUNTER, JOHN STASSEN, JOHN C. MULLEN, CLARK W. FETRIDGE, RESPICIO F. VASQUEZ and BERNARD J. MILLER, | ) ) ) ) ) | THE HONORABLE STUART PALMER, |
| Intervenors-Appellees. | ) | JUDGE PRESIDING. |

JUSTICE HOFFMAN delivered the opinion of the court:

Following a remand from the Illinois Supreme Court, the Circuit Court of Cook County entered an order finding that the plaintiff, 1350 Lake Shore Associates (LSA), failed to prove a clear right to a writ of <u>mandamus</u>, as its pre-development expenditures were not sufficiently substantial to acquire a vested right in the continuation of a former zoning

classification. LSA now appeals, raising a number of factual and legal challenges to the circuit court's decision. For the reasons which follow, we affirm.

The procedural history of this matter is long and complex, comprising over 11 years of litigation and numerous appeals. For the sake of brevity, we have attempted to limit our recitation of the facts to those necessary to resolve the issues presented in the instant appeal.

In 1952, LSA's predecessor in interest purchased the property located at 1320-30 Lake Shore Drive (the property) for $195,118.08. Twenty-six years later, on November 14, 1978, the Chicago City Council approved LSA's application to change the property's zoning from an "R8 General Residence District" classification to "Residential Planned Development 196" (RPD 196). The RPD 196 classification permitted the construction of a 40-story, 196-unit apartment building on the property.

After having secured the passage of RPD 196, LSA chose not to develop the property at that time. It was not until 1996 that LSA's agent, Draper and Kramer, Inc. (Draper), began investigating the possibility of developing the property in conformity with RPD 196. To that end, Draper hired Jack Guthman, an attorney specializing in zoning law, in early 1997. Draper also subsequently hired an architect, a surveyor, an urban

planner, an elevator consultant, and an artist to create a rendering from the architect's conceptual drawings.

In April or May of 1997, Guthman and representatives of Draper met with Charles Bernardini, then alderman of the ward in which the property is located. At that meeting, Bernardini was shown the preliminary designs for a high-rise building. Though Bernardini acknowledged that he did not mention changing the property's zoning classification at this time, he did inform Guthman and the Draper representatives that, due its size and density, the proposed development would be controversial and that, if they wanted his support, they should meet with neighborhood representatives and reach an agreement.

Shortly after the first meeting, Bernardini told Guthman that he had received complaints from neighbors regarding the project and that he was considering down-zoning the property if LSA and the neighbors could not reach a compromise. No agreement was reached, and, on December 10, 1997, Bernardini introduced an ordinance before the Chicago City Council to down zone the property to an "R6 General Residence District."

The next day, the project's architect submitted plans for a high-rise building to the City of Chicago's Department of Planning and Development, seeking the issuance of a Part II Approval letter. For a property located in a planned

No. 1-09-1126

development, a Part II Approval letter is a prerequisite to the issuance of a zoning certificate, which, in turn, is a prerequisite to the issuance of a building permit. See Chicago Zoning Ordinance § 11.5 (amended 7-21-00), § 11.11-3(b) (amended 12-11-91).

On April 29, 1998, the Chicago City Council approved the down-zoning ordinance. LSA never received a response from the Department of Planning and Development regarding its request for a Part II Approval letter. Without a Part II Approval letter, LSA was unable to obtain a zoning certificate or a building permit.

On August 25, 1998, LSA filed a complaint naming as defendants the City of Chicago (City) and the Commissioner of the Department of Planning and Development. In relevant part, LSA's complaint sought a writ of mandamus directing the Commissioner to issue a Part II Approval letter[1]. Thereafter, certain

_____

[1]LSA's complaint also contained a count seeking a declaration that the down-zoning ordinance did not affect its right to develop the property in conformity with RPD 196 and an injunction barring the City of Chicago from enforcing the down-zoning ordinance. This count, however, was later voluntarily dismissed on LSA's own motion. In addition, the complaint sought a declaration that the down-zoning ordinance was void. Following a trial on this issue,

-4-

No. 1-09-1126

individuals who lived within 250 feet of the property at issue were allowed to intervene.

Following a trial, the circuit court ruled in favor of the defendants and the intervenors, finding that a Part II Approval letter need not be issued because a down-zoning ordinance was pending before the city council. On appeal, we concluded that the circuit court erroneously relied upon the pending-ordinance doctrine and remanded the case with directions that a writ of mandamus be entered requiring that a Part II Approval letter be issued. 1350 Lake Shore Associates v. Hill, 326 Ill. App. 3d 788, 798, 761 N.E.2d 760 (2001) (Lake Shore I).

Upon remand, the intervenors filed a motion seeking a declaration that LSA was not entitled to a zoning certificate or building permit for the development of its proposed high-rise building. LSA then amended its complaint, seeking orders requiring the City to issue it a zoning certificate and enjoining the City from interfering with its rights under RPD 196.

the circuit court found that the challenged ordinance was constitutionally valid as applied to the property, and we previously affirmed the court's findings in this regard. 1350 Lake Shore Associates v. Casalino, 352 Ill. App. 3d 1027, 1048-49, 816 N.E.2d 675 (2004).

Although the circuit court ordered that a Part II Approval letter be issued, it held that LSA did not have a vested right to the issuance of a zoning certificate or building permit. The circuit court specifically found that the expenditures incurred by LSA were not made in good-faith reliance on the RPD 196 zoning classification, but were made in the hope of reaching a compromise with the neighborhood representatives.

On appeal, this court concluded that LSA's vested-rights claim required additional findings of fact. Accordingly, we remanded the matter to the circuit court with directions to make specific findings as to: (1) the date on which LSA knew or should have known that it was probable that Bernardini would introduce a down-zoning ordinance; (2) the total amount of the expenses incurred by LSA in connection with the project as of that date; and (3) whether those expenses were substantial enough to give rise to a vested right to the issuance of a zoning certificate and building permit pursuant to RPD 196. 1350 Lake Shore Associates v. Mazur-Berg, 339 Ill. App. 3d 618, 640-41, 791 N.E.2d 60 (2003) (Lake Shore II).

On remand, the circuit court determined that: (1) LSA knew it was probable that Bernardini would introduce a down-zoning ordinance on any date after the meeting in April or May of 1997

-6-

between Guthman, the Draper representatives, and Bernardini; (2) as of that date, LSA had expended $18,900.16 in connection with the project; and (3) the expenditures were not sufficiently substantial to give LSA a vested right to the issuance of a zoning certificate and building permit under RPD 196. LSA appealed once again.

While this court affirmed the circuit court's findings (1350 Lake Shore Associates v. Casalino, 363 Ill. App. 3d 806, 823, 842 N.E.2d 274 (2005) (Lake Shore III)), the Illinois Supreme Court reversed, concluding that LSA knew or should have known that it was not probable that its project would be approved only after Bernardini introduced the down-zoning ordinance in the city council on December 10, 1997 (1350 Lake Shore Associates v. Healey, 223 Ill. 2d 607, 622-23, 861 N.E. 2d 944 (2006) (Healey)). The supreme court remanded the matter back to the circuit court for a determination of the amount of expenses incurred by LSA as of December 10, 1997, and whether those expenses were sufficiently substantial to give LSA a vested right to develop the property under the former RPD 196 zoning classification. Healey, 223 Ill. 2d at 629-30.

Upon remand from the supreme court, the circuit court allowed LSA to present the testimony of two additional witnesses,

Frederick Ford and Matthew Medlin. Ford testified that he was the executive vice president and treasurer of D & K Insurance Agency, Inc., one of the general partners of LSA. Based on his experience in the real estate industry and his experience overseeing LSA's financial planning, Ford believed that LSA is a "very risk averse company." He testified that the partners of LSA "were for the most part wealthy people who didn't need you to speculate with their money." Ford also believed that LSA was a "frugal," "penny-pinching operation."

Over the City's relevancy objections, Medlin, a certified public accountant, testified as an expert witness. Medlin reviewed LSA's financial statements and found that its pre-development expenditures of $272,022 represented more than 12% of its net income in 1997, over 10% of LSA's cash flow from operations, more than 6% of its gross profits, over 2% of its total revenues, more than 1% of LSA's total depreciable assets, and more than 4% of its owners' equity. Based on these benchmarks, Medlin believed that LSA's expenditures were material from an accounting perspective. Medlin testified that materiality is determined by resolving the inquiry as to whether a reasonable person, such as a potential investor or banker

considering a loan, would be adversely influenced if the expenditures were not included in LSA's financial statements.

On March 25, 2009, the circuit court issued a written memorandum order in which it determined that LSA incurred $272,022.18 in expenditures before the down-zoning ordinance was introduced on December 10, 1997. In its decision, the circuit court rejected Medlin's testimony, finding it "marginally relevant" but not persuasive to the matters before the court. It also rejected Ford's testimony that LSA was frugal and "penny pinching" as "too subjective and self-serving" and, instead, found LSA to be a large entity with substantial profits and assets that could easily absorb the loss of $272,022.18. Noting that LSA's expenditures amounted to less than ½ of 1% of the $72 million to $76 million total projected cost of the development, the court found that these expenditures were not sufficiently substantial to give LSA a vested right in the former RPD 196 zoning classification. The circuit court concluded that LSA failed to prove a clear right to mandamus relief and entered judgment for the defendants. The instant appeal followed.

In urging reversal, LSA contends that the circuit court erred in finding that $272,022.18 in pre-development expenditures was not sufficiently substantial to acquire a vested right to

develop the property in accordance with the RPD 196 zoning classification. It asserts that the circuit court applied incorrect legal criteria and that the court's decision is against the manifest weight of the evidence.

Before addressing the merits of LSA's arguments, we must first determine our standard of review. <u>Mandamus</u> is an extraordinary remedy traditionally used to compel a public officer's performance of an official duty that does not involve an exercise of discretion. <u>People ex rel. Birkett v. Jorgensen</u>, 216 Ill. 2d 358, 362, 837 N.E.2d 69 (2005). Typically, the decision to grant or deny a writ of <u>mandamus</u> will not be disturbed on appeal unless it is against the manifest weight of the evidence. <u>Lombard Historical Comm'n v. Village of Lombard</u>, 366 Ill. App. 3d 715, 719, 852 N.E.2d 916 (2006). That is to say, only when the opposite conclusion is clearly evident or where the factual findings upon which it is based are unreasonable, arbitrary, or not based on the evidence. <u>IMC Global v. Continental Insurance Co.</u>, 378 Ill. App. 3d 797, 804, 883 N.E.2d 68 (2007). However, the question of whether the circuit court applied the correct legal standard is one of law, which we review <u>de</u> <u>novo</u>. <u>NC Illinois Trust Co. v. National City Bank of Michigan/Illinois</u>, 351 Ill. App. 3d 311, 314, 812 N.E.2d

No. 1-09-1126

1038 (2004).  With these standards of review in mind, we now turn to the issues raised on appeal.

A municipality has the right to amend its zoning ordinances (Ropiy v. Hernandez, 363 Ill. App. 3d 47, 51, 842 N.E.2d 747 (2005)), and one who purchases land is charged with the understanding that its zoning classification may be changed in the future (Furniture LLC v. City of Chicago, 353 Ill. App. 3d 433, 438, 818 N.E.2d 839 (2004)).  Accordingly, the general rule is that a property owner has no vested right in the continuation of a zoning classification.  Pioneer Trust & Savings Bank v. County of Cook, 71 Ill. 2d 510, 517, 377 N.E.2d 21 (1978). Illinois courts, however, have recognized an exception to this rule.

Under the vested-right doctrine, a property owner may acquire a vested right in a prior zoning classification where the owner sustained a significant change of position, by either making substantial expenditures or incurring substantial obligations, in good-faith reliance upon the probability of the issuance of a building permit.  People ex rel. Skokie Town House Builders, Inc. v. Village of Morton Grove, 16 Ill. 2d 183, 191, 157 N.E. 2d 33 (1959); Furniture LLC, 353 Ill. App. 3d at 437. The purpose of this exception is to mitigate the unfairness

caused by a zoning change after a property owner has undergone a substantial change of position in good-faith reliance on the prior zoning classification. Healey, 223 Ill. 2d at 626.

The determination of whether a property owner has obtained a vested right in a former zoning classification by reason of making substantial expenditures or incurring substantial obligations requires the resolution of two questions. First, it must be determined which of the expenditures made or obligations incurred by the property owner were done in good-faith reliance on the probability that it would obtain the necessary approvals to develop the property pursuant to the prior zoning classification. Healey, 223 Ill. 2d at 615, 623. Second, it must be determined whether those expenditures or obligations were substantial. Healey, 223 Ill. 2d at 615, 629-30.

As noted above, the supreme court previously determined that as of December 10, 1997, the date on which the down-zoning ordinance was introduced to the city council, LSA knew or should have known that it was improbable that it would receive the necessary approvals to complete its project in accordance with RPD 196. See Healey, 223 Ill. 2d at 622-23. Following a remand, the circuit court concluded that, as of that date, LSA's expenditures totaled $272,022.18. On appeal, the parties have

raised no argument addressing the circuit court's calculation of LSA's expenditures. Consequently, we focus our consideration on whether the expenditure of $272,022.18 by LSA was substantial enough to give rise to a vested right to develop the property under the RPD 196 zoning classification.

In determining whether expenditures are substantial, courts evaluate the totality of the circumstances, including: (1) a comparison of the expenses incurred to the total projected cost of the development; (2) the purchase price of the land; (3) the nature or character of the person or entity seeking to develop the property; and (4) any other factor that may be deemed relevant. Healey, 223 Ill. 2d at 627. No single factor is controlling, and each case presents a unique factual situation which must be assessed when determining substantiality. Healey, 223 Ill. 2d at 626-27.

Initially, LSA argues that the circuit court erred in discounting Medlin's testimony regarding the materiality of its pre-development expenditures. It asserts that courts applying Illinois law have often used the concepts of "material" and "substantial" interchangeably. See e.g., Thacker v. U.N.R. Industries, Inc., 151 Ill. 2d 343, 354-355, 603 N.E.2d 449 (1992) ("Under the 'substantial factor' test, which has been adopted by

the Restatement (Second) of Torts, the defendant's conduct is said to be a cause of an event if it was a <u>material</u> element and a <u>substantial</u> factor in bringing the event about") (Emphasis added.); <u>Opp v. Wheaton Van Lines, Inc.</u>, 56 F. Supp. 2d 1027, 1034 n.5 (N.D. Ill. 1999) ("The doctrine of '<u>substantial</u> compliance' or '<u>substantial</u> performance' dictates that 'when a party performs the essential, <u>material</u> parts of a contract in good faith,' even if literal compliance with the terms is lacking, the other party may be bound") (Emphasis added.). According to LSA, Medlin's opinion that its expenditures were material from an accounting perspective should, likewise, be considered relevant to the question of whether its pre-development expenditures were substantial for the purposes of acquiring a vested right. We disagree.

In this case, Medlin reviewed LSA's financial statements and found that its expenditures of $272,022 represented more than 12% of its net income in 1997, over 10% of LSA's cash flow from operations, more than 6% of its gross profits, over 2% of its total revenues, more than 1% of LSA's total depreciable assets, and more than 4% of its owners' equity. Based on these benchmarks, Medlin opined that LSA's pre-development expenditures were material from an accounting perspective. Although LSA seeks

No. 1-09-1126

to equate materiality from an accounting perspective with substantiality in the context of a vested-rights case, the two concepts do not utilize the same determinative criteria and are not interchangeable.

Materiality from an accounting standpoint compares expenditures to a number of financial benchmarks to determine whether they must be included in the financial statements; whereas, substantiality in the vested-rights context compares expenditures to the total projected cost of the development in order to determine whether a property owner has acquired a vested right in a prior zoning classification. See People ex rel. Skokie Town House Builders, 16 Ill. 2d at 191. Furthermore, substantiality employs a broader test, taking into account additional factors, such as the nature or character of the property owners. See Healey, 223 Ill. 2d at 627.

For evidence to be relevant, it must have the tendency to make a fact of consequence to the determination of the action more or less probable. Voykin v. Estate of Deboer, 192 Ill. 2d 49, 57, 733 N.E.2d 1275 (2000). Given the dissimilarities between materiality and substantiality, Medlin's testimony regarding the material nature of LSA's expenditures from an accounting perspective provided little, if any, assistance to the

circuit court in its determination as to whether those same expenditures were substantial for purposes of applying the vested-rights doctrine. It was the function of the circuit court, as the trier of fact, to determine the weight to be afforded the evidence, and the court's decisions in this regard will not be overturned on appeal unless they are against the manifest weight of the evidence. Eychaner v. Gross, 202 Ill. 2d 228, 251, 779 N.E.2d 1115 (2002). Under the facts of this case, we conclude that the circuit court's findings that Medlin's testimony was "marginally relevant" and unpersuasive are not against the manifest weight of the evidence.

Next, LSA argues that the circuit court's finding that its pre-development expenditures were insubstantial is contrary to the long history and precedents of Illinois vested-rights jurisprudence. In its briefs before this court, LSA cites to a litany of cases in which expenditures less than $272,022.18 have been considered substantial. See e.g., Illinois Mason Contractors, Inc. v. City of Wheaton, 19 Ill. 2d 462, 465, 167 N.E.2d 216 (1960) ($30,000 contract for work to be done, purchase of $5,000 in construction materials, and a $3,250 loan commission); People ex rel. Skokie Town House Builders, Inc., 16 Ill. 2d at 191-92 ($26,000 for the purchase of the property and

$1,830 in permit fees and sidewalk deposit); Constantine v. Village of Glen Ellyn, 217 Ill. App. 3d 4, 25, 575 N.E.2d 1363 (1991) ($70,100 purchase price of the property and $1,400 architect fee); O'Connell Home Builders, Inc. v. City of Chicago, 99 Ill. App. 3d 1054, 1061, 425 N.E.2d 1339 (1981) ($17,500 spent on architectural fees and tree removal service); Mattson v. City of Chicago, 89 Ill. App. 3d 378, 381, 411 N.E.2d 1002 (1980) (demolition of home valued at $40,000 plus $4,100 in demolition and architectural fees); Sgro v. Howarth, 54 Ill. App. 2d 1, 9-10, 203 N.E.2d 173 (1964) ($23,500 for the purchase of the property plus undisclosed permit fees). The difficulty with these cases, however, is that they only reference the amount of expenditures incurred and do not identify the total projected costs of the developments or provide a comparison of the expenditures to the projected development costs.

In Healey, the Illinois Supreme Court acknowledged for the first time that the proportionality between the expenditures incurred and the total projected cost of the development was a factor to be considered in determining substantiality. See Healey, 223 Ill. 2d at 626-27. In adopting proportionality as a factor, the supreme court held that the determination as to whether a property owner has made a substantial change of

position in good-faith reliance on the probability of obtaining a building permit could not be decided "by considering only the objective amount of expenditures in a vacuum." Healey, 223 Ill. 2d at 626-27. In light of the supreme court's holding in Healey, the precedential value of the prior vested-rights cases cited by LSA is limited, at best.

Our own research has reveled a single Illinois vested-rights case that clearly contains both the expenditures and the total projected cost of the development, Cribbin v. City of Chicago, 384 Ill. App. 3d 878, 893 N.E.2d 1016 (2008). In Cribbin, this court concluded that the property owners' pre-development expenditure of $260,000 was substantial. Cribbin, 384 Ill. App. 3d at 894. The facts of that case further demonstrate that the owners intended to construct three buildings on the property at a total cost of $950,000. Cribbin, 384 Ill. App. 3d at 883. Accordingly, the $260,000 in expenditures found to be substantial in Cribbin represented more than 27% of the total projected cost of the development.

In this case, however, the $272,022.18 in expenditures incurred by LSA prior to December 10, 1997, amounted to less than ½ of 1% of the estimated $72 million to $76 million total projected cost of the development. We believe that LSA's

No. 1-09-1126

expenditures, when viewed in relation to the ultimate cost of the development, cannot be considered substantial.

In reaching this conclusion, we reject LSA's assertion that reliance on a strict mathematical comparison of the expenditures to the projected development costs would "effectively end" vested-rights claims for developers, as any pre-development expenditures incurred by a property owner before receiving a building permit will necessarily be a small fraction of the total costs of the project, particularly when the development is a large structure. The vested-rights doctrine is the exception, not the rule. Until the property owner has made a substantial change of position, the municipality has an ongoing right to amend its zoning ordinances. See Ropiy, 363 Ill. App. 3d at 51. In the event that an existing zoning ordinance changes prior to the accrual of a vested right in that zoning classification, the property owner has no cause to object to a rezoning. See Shepard v. Illinois Pollution Control Board, 272 Ill. App. 3d 764, 772, 651 N.E.2d 555 (1995); County of Kendall v. Aurora National Bank, 219 Ill. App. 3d 841, 850, 579 N.E.2d 1283 (1991). Moreover, LSA's argument is belied by the facts of Cribbin, where the pre-development expenditures equaled more than 27% of the total cost of the project even though no construction permit had issued.

See Cribbin, 384 Ill. App. 3d at 880, 894. Consequently, we believe it is unlikely that our decision will "effectively end" vested-rights claims for developers.

LSA also alleges that a strict mathematical comparison of the expenditures to the projected development costs would be "subject to manipulation by encouraging developers to build with cheaper materials or to refuse to agree to changes requested by the community that could raise development costs." However, as LSA's musings in this regard are unanchored and undeveloped, we find them to be lacking in merit with no need for further discussion.

We, likewise, reject LSA's contention that the circuit court's decision erroneously suggested that expenditures less than 2% of the total projected cost of the development could not be considered substantial. In its March 25, 2009, order, the circuit court stated that "[i]t is worth noting" that this court had used a $20,000 expenditure toward a $1 million project, or an expenditure equal to 2% of the projected development cost, as an example of an insubstantial expenditure. See Lake Shore III, 363 Ill. App. 3d at 822, rev'd on other grounds, Healey, 223 Ill. 2d at 629-30. Despite LSA's assertions to the contrary, neither we nor the circuit court held that 2% is the minimum threshold that

must be reached for an expenditure to be considered substantial. Our reference in Lake Shore III to "[a] developer who spends $20,000 on a project estimated to cost $40,000 is in quite a different position than a developer who spends $20,000 on a project estimated to cost $1 million," was merely an explanation of the rationale for comparing the amount spent on a proposed development to the total cost of the project, not a minimum threshold. See Lake Shore III, 363 Ill. App. 3d at 822, rev'd on other grounds, Healey, 223 Ill. 2d at 629-30.

LSA next argues that the circuit court erred in determining its nature or character and improperly concluded that the nature or character of a property owner, for the purposes of the vested-rights doctrine, turns on whether the owner was an individual homeowner or a large developer.

Contrary to LSA's contention, the circuit court did not base its determination of LSA's nature or character on its status as either an individual homeowner or large developer. Rather, the court's decision in this regard was based on the fact that LSA had substantial profits and assets and, therefore, could easily absorb the loss of $272,022.18. Specifically, the circuit court noted that LSA's assets included: (1) the property at issue, valued at $6 million in 1997; (2) two, 22-story high-rise

buildings with 740 units located at 1350-60 North Lake Shore Drive; (3) a 27% interest in Second Prairie Shores Apartments; (4) a 9% interest in Third Prairie Shores Apartments; and (5) a 10% interest in Astor Lane Associates, which owns high-rise residential and industrial buildings throughout Chicago. The court also noted that LSA's depreciable assets totaled more than $25 million in 1996 and more than $26 million in 1997; that LSA's net income was almost $1.9 million in 1996 and almost $2.2 million in 1997; that executives at Draper testified that LSA had "significant assets" and, as such, financing the construction project would not have been difficult; that LSA has four general partners and more than 100 limited partners, who are considered "wealthy" individuals; and that distributions of $46 million were made to the partners in 2000 and 2001.

In Lake Shore III, we held that courts should consider the character of the entity incurring the cost of the development, noting that what might be considered a large investment for an individual homeowner could be considered minimal for a large land developer. Lake Shore III, 363 Ill. App. 3d at 822. The supreme court subsequently adopted the nature or character of the person or entity seeking to develop the property as a factor to be taken into account in making a substantiality determination. Healey,

223 Ill. 2d at 627. Although LSA sought to establish that it was a "frugal" and "penny-pinching organization" through the testimony of Ford, we do not believe that the circuit court erred in rejecting Ford's subjective views of the nature or character of LSA. Instead, the court relied on objective evidence, such as LSA's assets and profits, in making this determination.

Alternatively, LSA takes issue with some of the circuit court's factual findings regarding its nature or character. In particular, LSA contends that the circuit court ruled that evidence concerning the distributions made to partners after 1997 was inadmissible. Our review of the record, however, reveals that, while the circuit court found that LSA's financial statements from the years 2000 to 2006 were not "independently relevant" for the purposes of evaluating Medlin's expert testimony, the court had previously admitted LSA's 2000 and 2001 financial statements into evidence. As the circuit court's decision only referenced distributions made in 2000 and 2001, we cannot say that the court considered evidence that was not before it.

Additionally, LSA asserts that the circuit court erroneously looked past the entity that actually incurred the expenses and considered the wealth of its individual partners. However, even

assuming that it was improper for the circuit court to consider the wealth of LSA's partners, any such error would be harmless. When considered in light of the remaining evidence cited by the circuit court, we do not believe that the brief and passing reference to the "wealthy" individual partners could have affected the outcome of the court's decision. See Hadley v. Snyder, 335 Ill. App. 3d 347, 351-52, 780 N.E.2d 316 (2002) (finding an error which did not affect the outcome of the case to be harmless).

In a related argument, LSA maintains that the circuit court erred in considering Draper's assets in determining its nature or character. Although the circuit court initially noted that LSA and "its closely tied affiliate [Draper] are large entities with substantial assets," all of the specific assets listed in the circuit court's decision related to LSA, not Draper. Accordingly, it does not appear that the circuit court actually considered any of Draper's assets in making its decision regarding LSA's nature or character.

LSA also asserts that, in determining its nature or character, the circuit court: (1) "purported to rely" on the fact that its net income was almost $1.9 million in 1996 and almost $2.2 million in 1997, "without explaining why expenditures

-24-

of 14% and 12% respectively" are not substantial; (2) referenced the two large buildings it owned, "but failed to draw the obvious conclusion that spending hundreds of thousands of dollars in cash is even more significant to landowners with limited cash because most of their assets [are] tied up in non-liquid holdings"; and (3) "cited to the $6 million value of the subject property - but did not explain why spending nearly 5% of that value (and over 22% of the purchase price when adjusted for inflation) is not substantial."  Though LSA has labeled these assertions as "contrived and erroneous conclusions" of the circuit court, LSA is, in fact, merely asking us to reweigh the evidence presented in this case.  As previously discussed, the circuit court was required to weigh the evidence, and its inferences and conclusions drawn therefrom will be disturbed on review only if they are contrary to the manifest weight of the evidence. Eychaner, 202 Ill. 2d at 251.

Based on the record before us, we are unable to conclude that the circuit court's characterization of LSA as a large entity with substantial profits and assets, which allowed it to easily absorb the loss of $272,022.18, is against the manifest weight of the evidence.

No. 1-09-1126

Finally, LSA contends that the circuit court erred in failing to take into account the cost of the property when determining whether its expenditures were substantial. While the purchase price of the property is a factor that may be considered in determining substantiality (see Healey, 223 Ill. 2d at 627), only those expenditures made in good-faith reliance on the prior zoning classification are included in the substantiality determination (see Ropiy, 363 Ill. App. 3d at 52-53). In this case, the property at issue was purchased 26 years before RPD 196 was enacted. Because it is clear that the property was not purchased in reliance on the RPD 196 zoning classification, the purchase price was properly excluded from consideration in this case.

Based on the totality of the circumstances, we cannot say that the circuit court's finding that LSA's $272,022.18 in pre-development expenditures was not sufficiently substantial to give rise to a vested right to develop the property in accordance with the RPD 196 zoning classification is contrary to the law or against the manifest weight of the evidence. Absent proof of a vested right, LSA was not entitled to a zoning certificate or building permit under RPD 196. See Healey, 223 Ill. 2d at 628.

Accordingly, the circuit court properly denied LSA's request for a writ of <u>mandamus</u>.

For the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

THEIS and KARNEZIS, JJ., concur.