2022 IL App (2d) 200299-U
No. 2-20-0299
Order filed January 31, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| TLT LEASING, INC., GREAT LAKES ANTIQUES-BOUTIQUE, INC., TLT FINANCIAL, LLC, TRENT TOBIAS, and LAURIANNE TOBIAS, | ) ) ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | No. 18 L 195 |
| THE VILLAGE OF ANTIOCH, | ) ) | Honorable Mitchell L. Hoffman, |
| Defendant-Appellant. | ) ) | Judge, Presiding. |

_____

**ORDER**

JUSTICE BIRKETT delivered the judgment of the court.
Justices McLaren and Schostok concurred in the judgment.

¶ 1    *Held*:   The trial court erred in finding that the Village's breach of an annexation agreement entitled plaintiffs to specific performance and a writ of *mandamus*.

¶ 2    Defendant, the Village of Antioch (Village), appeals the trial court's order granting a writ of *mandamus* and specific performance in favor of plaintiffs, TLT Leasing, Inc. (TLT Leasing), Great Lakes Antiques-Boutique, Inc. (Great Lakes), TLT Financial, LLC, (TLT Financial), Trent Tobias (Trent) and Laurianne Tobias (Laurianne). We reverse.

¶ 3                                    I. BACKGROUND

¶ 4    We summarize the relevant facts. Trent and Laurianne are the sole owners and officers of TLT Leasing and TLT Financial. In February 2015, TLT Leasing purchased a parcel of land located at Route 83 and Beach Grove Road in unincorporated Lake County (property). On March 31, 2015, Trent and Laurianne incorporated Great Lakes with the Illinois Secretary of State, through which they began operating an antiques boutique on the property. The boutique was comprised of two large barns and a consignment mall. In July 2016, TLT Leasing transferred ownership of the property to TLT Financial.

¶ 5    On October 5, 2016, Trent filed a petition to annex the subject property into the Village, attaching a draft annexation agreement (agreement) to the petition. On January 30, 2017, the Village entered into the agreement with Trent, agreeing that it would adopt any "ordinances annexing and zoning the [property] *** to zoning classification B-3."

¶ 6    Pursuant to section 17 of the agreement, "[n]o variances will be necessary to develop the property." Instead, "[i]f variances are required, they shall be described and attached as an Amendment, Exhibit C." Pursuant to section 20 of the agreement, "[a]ny modifications to the VILLAGE'S standard annexation agreement provisions are set forth in Exhibit C. The OWNER, DEVELOPER and VILLAGE agree that[,] should any conflicts between Exhibit C and the text of this Agreement exist, the provisions of Exhibit C shall supersede those of this text."

¶ 7    Exhibit C of the agreement, which is entitled, "Variances," provides:

> "Owner/Developer shall be allowed the following variances not otherwise allowed in the proposed B-3 zoning district:
>
> ***
>
> Class E Bar and Tavern license and related gaming license shall be allowed upon compliance with other required Village of Antioch and State of Illinois requirements."

¶ 8    Exhibit B of the agreement includes a concept plan for the property, including diagrams of prospective structures. The concept plan includes a small building in the southern portion of the property, labeled "One Story Metal Building," which, according to the plan, would later be converted to a coffee shop that offered liquor and possible videogaming.

¶ 9    On February 6, 2017, the Village held a public hearing on the petition for annexation. On February 20, 2017, the Village passed Antioch Municipal Code § 17-02-04 (Feb. 20, 2017), annexing the property into the Village and rezoning it as requested.

¶ 10    On June 15, 2017, Great Lakes applied to the Village for a Class E liquor license and a videogaming license. While the agreement had previously indicated that the "[o]ne [s]tory [m]etal [b]uilding" would be utilized for future liquor sales and videogaming, the application instead indicated that a bar would be built into one of the two large barns on the property.

¶ 11    As part of the application process, Chief Steven Huffman of the Antioch Police Department interviewed Trent and Laurianne before investigating the property. On July 6, 2017, he issued a memorandum to the Village, finding that Great Lakes was "currently in full compliance with the Village of Antioch building and occupancy codes" and therefore "eligible to apply for a Class E liquor license." On September 11, 2017, the Village held a public hearing concerning the application for a liquor license. One village trustee, Scott Allen Pierce, moved to approve the application, but his motion was not seconded. Ultimately, Great Lakes did not receive the license.

¶ 12    On March 9, 2018, plaintiffs filed their complaint for breach of contract and other relief, alleging that the Village's refusal to issue plaintiffs a Class E liquor license "as provided in Exhibit C to the *** Agreement constitute[d] a breach of the *** Agreement." Count I of the complaint sought damages "in excess of $50,000," while Count II alternatively sought specific performance, in the form of a court order "compelling the Village to perform its obligations under the

[agreement] and approve a Class 'E' liquor license for plaintiffs' use on the subject property." Count III of the complaint sought a writ of *mandamus* similarly compelling the Village to approve plaintiffs' liquor license application.

¶ 13    On April 17, 2018, the Village moved to dismiss plaintiffs' complaint pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2018)), arguing that plaintiffs failed to sufficiently allege a claim for breach of the agreement. On June 5, 2018, the trial court denied defendant's motion to dismiss.

¶ 14    On July 9, 2018, the Village admitted, relevantly, in its answer to plaintiffs' complaint that plaintiffs' "application [for the liquor license] met the standard requirements for applications asking the Village Board to exercise its discretion to create and thereafter grant a liquor license." On July 13, 2018, the Village filed two affirmative defenses. Its first affirmative defense alleged that the concept plan included in the petition for annexation constituted "a condition precedent for *** Plaintiff[s'] claimed right to a liquor license," suggesting that, before obtaining a liquor license, plaintiffs needed to first build certain buildings detailed in their earlier concept plan. The Village's second affirmative defense alleged unclean hands.

¶ 15    On January 11, 2019, the Village filed its motion for summary judgment, arguing that it had not breached the agreement, but instead had properly exercised its discretion in denying the liquor license application. On January 18, 2019, plaintiffs moved to strike the affidavit accompanying the Village's motion for summary judgment. On February 13, 2019, the trial court granted plaintiffs' motion to strike, and entered an order striking certain paragraphs from the affidavit.

¶ 16    On February 26, 2019, the Village filed its amended motion for summary judgment, arguing that the agreement only provided that "the property as zoned has variances that would

allow a business holding a liquor license to be located there, not that a liquor license would necessarily be issued to *** [p]laintiffs' business." The Village also argued that plaintiffs' reading of the agreement contradicted section 11-15.1-2 of the Illinois Municipal Code (65 ILCS 5/11-15.1-2 (West 2018)), and it repeated its earlier arguments concerning plaintiffs' failure to perform conditions precedent under the agreement. On April 30, 2019, the trial court denied the motion.

¶ 17    On July 24, 2019, a bench trial was scheduled for November 18, 2019. On November 13, 2019, the Village filed its motion *in limine* to allow parol evidence, requesting permission to present sworn testimony made by plaintiffs' counsel at the annexation hearing, purportedly relating to plaintiffs' original interpretation of the agreement. On November 15, 2019, the trial court denied the motion *in limine*. Plaintiffs voluntarily dismissed Count I of their complaint.

¶ 18    During opening arguments, the following colloquy occurred:

> "[PLAINTIFFS]: [W]e have a contract, and it's only the contract that gives us the right to the license once we have complied with the  specific requirements set forth in the code, because I don't think that we can read out of that question the opening sentence of Exhibit C, 'owner/developer shall be allowed the following variances not otherwise proposed in the B-3 zoning districts.' Shall be allowed. That's not speaking—
>
> THE COURT: I'm sorry to interrupt. Is the liquor license a variance?
>
> [PLAINTIFFS]: The word 'variance' as it pertains to all of those isn't exactly the most precise word, and I'm not certain I would use that word, but it clearly says that the owner/developer shall be allowed. Whether you call it a variance of a right or an interest."

¶ 19    The Village moved for a directed finding at the close of plaintiffs' case-in-chief, prompting the following colloquy:

> "[THE VILLAGE]: We do disagree on what the contract really requires. We read

it as the zoning ordinance, because you have to read that first sentence for this to make any sense. The first sentence says that they will be allowed the following variances not otherwise allowed in the proposed B-3 zoning district. That's a really important part of it.

And the fact is you have to have—whatever property you have to support a liquor license has to fall within a recognized and approved zoning district.

THE COURT: Just so I understand, normally under a B-3 zoning district you could not have any establishment with a liquor license? Is that what you are saying?

[THE VILLAGE]: No. And that's where part of the tricky aspect of this argument comes from, because under our zoning code in Antioch[,] it says B-3 can support a liquor license. The only thing that—the way we read this phrase is that if the B-3 zoning district was removed or the zoning district requirements were altered, they would still qualify for a liquor license in the zoning context during the life of this annexation agreement. The annexation agreement is good for 20 years, and once you've got a business that's established within the zoning district, it's grandfathered in even if the zoning regulations change."

¶ 20    The trial court denied the Village's motion and the Village called Pierce to testify. On cross-examination, Pierce verified that, as things currently stood, the property's B-3 zoning district currently allowed for the application of liquor licenses.

¶ 21    During closing arguments, the Village once again suggested that Exhibit C was only meant to secure Great Lakes' eligibility for a liquor license if the Village's zoning regulations were later amended:

"[THE VILLAGE]: [I]n this point in time, the Village does allow liquor licenses in B-3. However, there is no assurance that the Village Board anywhere else in any

annexation agreement other than this one that the Village Board couldn't change the zoning and could say B-3 no longer allows liquor licenses."

THE COURT: But that's not what the agreement says. It doesn't say we are not—we're promising not to change the zoning.

[THE VILLAGE]: Sure it does.

THE COURT: If the parties wanted to say that, they could have said that.

[THE VILLAGE]: Absolutely, that's what it says. That's the way we read this.

THE COURT: That's the way you read it. That's not what it says.

***

The way you are reading [Exhibit C], it, it's as though that entire sentence about the liquor license is not even in that agreement. You are operating—you are saying the Village would operate no differently if that sentence were entirely omitted from the agreement, in which case why is it in the agreement?

[THE VILLAGE]: Well, *** we have to read this in some way that makes sense. You try to give as much meaning to every word inside of a document as you possibly can."

¶ 22   On April 13, 2020, the trial court issued its memorandum order. In the order, the court concluded that "[plaintiffs have] proved that [they] complied with the provisions of the Annexation Agreement, and that [they] ha[ve] a clear right under that agreement to be awarded a liquor license by the Village." The court issued judgment in favor of plaintiffs and against the Village as to Counts II and III and ordered the Village to grant a liquor license to plaintiffs, subject to the results of a new background check. The Village timely appealed.

¶ 23                                    II. ANALYSIS

¶ 24   On appeal, the Village raises four main arguments. First, the Village argues that the trial

court misinterpreted the plain, unambiguous language of the agreement. Second, the Village argues that the trial court misinterpreted the agreement by failing to consider the concept plan included in Exhibit B to the agreement. Third, the Village asserts that the trial court's decision infringed its right to exercise its discretion in granting or denying liquor licenses. Fourth, the Village argues that the trial court improperly barred parol evidence that evinced plaintiffs' "unclean hands in attempting to mend their contractual undertakings." Because we agree that the trial court misinterpreted the plain language of the agreement, we need only consider the Village's first contention.

¶ 25                          A. Preliminary Matters

¶ 26    Before turning to the merits of this appeal, we address plaintiffs' arguments regarding the propriety of the Village's opening brief. Specifically, plaintiffs argue that 1) the Village violated Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020) by improperly commingling facts with argument; 2) the Village failed to adhere to Illinois Supreme Court Rule 341(h)(3) (eff. Oct. 1, 2020) by omitting a statement of the relevant issues from its brief; and 3) the Village's brief improperly referenced parol evidence from the public annexation hearing. Plaintiffs do not request specific relief regarding their first two arguments, but they request that we strike all of the Village's arguments that rely on their attorney's comments during the annexation hearing.

¶ 27    Illinois Supreme Court Rule 341(h) governs the contents of an appellant's brief. *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 7. "[T]he Illinois Supreme Court rules are not mere suggestions; they have the force of law, and we may strike portions of a brief or dismiss an appeal when the circumstances warrant such sanctions," specifically when a brief's deficiencies hinder our review. *Morse v. Donati*, 2019 IL App (2d) 180328, ¶ 16; *Hall*, 2012 IL App (2d) 111151, ¶ 9.

¶ 28    Here, we disagree with plaintiffs' contentions that the Village's brief violated Rule 341(h)(6). Rule 341(h)(6) requires appellants to include a statement of facts within their briefs, "which shall contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment, and with appropriate reference to the pages of the record on appeal." Ill. S. Ct. R. 341(h)(6). Here, we have carefully reviewed the Village's statement of facts along with plaintiffs' contentions regarding improper argument. We determine that the Village's statement of facts is fair and nonargumentative. Indeed, plaintiffs illustrate the purported violation by citing to the Village's argument, not its statement of facts. Rule 341(h)(6), by its very terms, does not apply to the argument portion of an appellant's brief. *Id.* Accordingly, we reject plaintiffs' contention.[1]

¶ 29    Second, while we agree that the Village violated Rule 341(h)(3), this failure does not warrant any sanctions. Pursuant to Rule 341(h)(3), an appellant's brief should include "a statement of the issue or issues presented for review, without detail or citation of authorities." Ill. S. Ct. R. 341(h)(3). Here, as noted by plaintiffs and conceded by the Village, the Village's opening brief does not contain such a statement. However, because the pertinent issues may nonetheless be inferred from glancing at the Village's table of points and authorities, its omission does  not

---

[1] Plaintiffs bring forth this specific argument in their statement of facts. Therefore, unlike the Village's brief, plaintiffs' brief *does* fail to comply with Rule 341(h)(6). Given the relatively small record before us, however, we cannot say that plaintiffs' error hinders our review. Nonetheless, we admonish plaintiffs to comply with Rule 341(h)(6) in the future, and recommend they heed the ancient aphorism concerning throwing stones from glass houses.

hinder our review. For this reason, we decline to sanction the Village for its error. Nevertheless, we admonish the Village to comply with our supreme court's rules more carefully in the future.

¶ 30    Third, we address plaintiffs' arguments concerning the Village's citations to parol evidence. Plaintiffs argue that, by referencing certain comments that plaintiffs' counsel made at the annexation hearing, the Village wrongfully "attempts to introduce parol evidence that was specifically excluded at trial." As a result of these described errors, plaintiffs argue that "all of the Village's arguments with respect to the [parol evidence] are waived and should not be considered by this court."

¶ 31    However, as we will further explain below, our resolution of the underlying matter rests solely upon the clear and unambiguous language of the agreement. As such, we do not rely on any parol evidence or other extrinsic aids in making our analysis. *Brady v. Prairie Material Sales*, *Inc.*, 190 Ill. App. 3d 571, 575 (1989). Consequently, plaintiffs' arguments to the point are moot.

¶ 32                      B. Plain Language of the Agreement

¶ 33    Turning to the merits of the appeal, we agree with the Village that the trial court misinterpreted the plain and ordinary meaning of the agreement. "In interpreting [an] [a]nnexation [a]greement, the basic rules of contract interpretation apply." *Reserve at Woodstock, LLC v. City of Woodstock*, 2011 IL App (2d) 100676, ¶ 39. In construing a contract, a court's primary objective is to examine the contract's language to give effect to the parties' intent. *Id.* Contracts should be examined in their entirety, "viewing each provision in light of the other provisions." *Id.* "The parties' intent is not ascertained by viewing a clause or provision in isolation, or by looking at detached portions of the contract." *Id.* Otherwise put, a reviewing court should give effect to all of a contract's language when possible and refrain from interpreting contracts in a manner that renders their provisions meaningless. *Hot Light Brands, L.L.C. v. Harris Realty, Inc.,*

392 Ill. App. 3d 493, 499 (2009). Where a contract's terms are clear and unambiguous, we ascertain the parties' intent solely from the language of the agreement and without the aid of extrinsic evidence. *Id.*

¶ 34    We review the trial court's interpretation of the agreement *de novo*. *Erlenbush v. Largent*, 353 Ill. App. 3d 949, 952 (2004) ("When *** the trial court interpret[s] [a] contract as a matter of law, our standard of review is *de novo*"). However, we do not disturb the trial court's grant of specific performance absent an abuse of discretion. *Schwinder v. Austin Bank of Chicago*, 348 Ill. App. 3d 461, 477 (2004). Appellate courts have been inconsistent as to the applicable standard of review for *mandamus* actions. *Pate v. Wiseman*, 2019 IL App (1st) 190449, ¶ 27. For example, some courts have utilized an abuse of discretion standard, while others have reversed a writ of *mandamus* only where a trial court's issuance of the writ was against the manifest weight of evidence. *Id.* We need not resolve the issue, because under either standard of review, the outcome is the same.

¶ 35    Here, the Village asserts that Exhibit C acted "only to protect the plaintiffs from possible zoning changes." In other words, the Village argues that Exhibit C was intended to be a grandfather clause preserving plaintiffs' eligibility for a liquor license if the property's zoning regulations were amended to otherwise preclude plaintiffs from obtaining a liquor license. In support of this argument, the Village points to Exhibit C's language referencing "variances not otherwise allowed in the proposed B-3 zoning district." According to the Village, these words evince the parties' intent that Exhibit C was only intended to relate to zoning changes, "particularly when [it is] possible for municipalities to change their zoning codes and prohibit uses within particular districts." The Village argues that, by ignoring this key language within

Exhibit C, the trial court erred in finding that the Village breached the agreement when it refused to issue a liquor license to plaintiffs.

¶ 36    Plaintiffs respond, arguing that, "if the Village desired to make the liquor license grant applicable only in the event that the B-3 zoning district was amended, the time to do so was in the drafting of the Annexation Agreement, not after the fact." Plaintiffs also argue that the Village's interpretation of Exhibit C is unsupported by any citations to authority "other than its own pleadings." Plaintiffs further contend that the only evidence that the Village may cite to bolster its interpretation of the agreement comes in the form of inadmissible parol evidence, specifically in the form of plaintiffs' counsel's comments at the public annexation hearing. Plaintiffs additionally argue that the Village's interpretation of Exhibit C renders the portions dealing with the grant of a liquor license "meaningless," because "[w]ithout the liquor license phrase, plaintiffs still would have been able to apply for a liquor license in the event the zoning classification changed."

¶ 37    We agree with the Village's interpretation. Again, Exhibit C, which both parties claim is operative, first provides that "Owner/Developer shall be allowed the following *variances not otherwise allowed in the proposed B-3 zoning district*." (Emphasis added.) From this opening phrase, it is clear that Exhibit C operates as a list of "variances" that plaintiffs shall be entitled to if they are "not otherwise allowed in the proposed B-3 zoning district." Indeed, this interpretation recognizes the plain meaning of the word, "variance," which "is [an] authority extended to a property owner to use his property *in a manner forbidden by the zoning enactment*." *County of Cook v. Monat*, 365 Ill. App. 3d 167, 174-75 (2006). (Emphasis added.) Consequently, before plaintiffs "shall be allowed" a "Class E Bar and Tavern License and related gaming license" under Exhibit C, plaintiffs' acquisition of the liquor license must constitute "a variance not otherwise

allowed in the proposed B-3 zoning district." Otherwise, the remaining language of Exhibit C, stating that a "Class E Bar and Tavern license and related gaming license shall be allowed" does not become operative. Therefore, because the parties agree that the Village's B-3 zoning currently allows plaintiffs to apply for a liquor license, Exhibit C cannot be seen as a conditional grant of a liquor license, made without regard to the Village's current zoning ordinances.

¶ 38　　To this point, plaintiffs' interpretation is flawed because it would necessarily render superfluous the phrase, "variance not otherwise allowed in the proposed B-3 zoning district." Therefore, plaintiffs' interpretation of Exhibit C runs counter to the interpretive principle that a proper interpretation of a contract gives meaning to every word in that contract. *Hot Light Brands*, 392 Ill. App. 3d at 499.

¶ 39　　Nonetheless, plaintiffs suggest that, if Exhibit C were intended to be a grandfather clause, the Village should have more carefully crafted the agreement. It is true that the agreement could have been more carefully drafted to make the Village's interpretation clearer. Still, the plain language of Exhibit C supports the Village's interpretation of the agreement, because unlike plaintiffs' interpretation, it gives effect to every word and phrase within Exhibit C. Furthermore, while the record does not clearly state which party drafted the agreement, because it was first included in Trent's annexation petition, we infer that plaintiffs were responsible for its construction. "A contract is to be strictly construed against its drafter." *Lake Bluff Hearing and Air Conditioning Supply, Inc. v. Harris Trust and Savings Bank*, 177 Ill. App. 3d 284, 294 (1983). Accordingly, if Exhibit C were intended to be operative regardless of the existence of any applicable variances, plaintiffs should have clearly stated so.

¶ 40　　We further reject plaintiffs' contentions that the Village's interpretation of Exhibit C lacks citation to relevant authority. It fair to say that the Village's citations to authority to this point are

relatively sparse. Even so, in making its argument, the Village cites to *Thompson v. Gordon*, 241 Ill. 2d 428, 443 (2011) for the proposition that "the rules of construction demand that all the relevant words [in a contract] be read together to give meaning to all of them." This tenet of contract interpretation underscores the crux of the Village's argument, that the trial court misinterpreted the agreement by ignoring pertinent language in Exhibit C relating to variances. As such, the Village has cited legal authority in support of its contentions. Consequently, because the Village's argument is supported by legal authority, we also disagree with plaintiffs' argument that the Village's interpretation of the agreement solely hinges on the application of parol evidence.

¶ 41 Finally, plaintiffs are incorrect in asserting that the Village's interpretation of the agreement renders portions of Exhibit C meaningless. Again, plaintiffs argue that, "to read [Exhibit C] the way the Village proposes would render the liquor license clause meaningless. Without the liquor license phrase, plaintiffs still would have been able to apply for a liquor license in the event the zoning classification changed."

¶ 42 We first note that plaintiffs have not cited any authority supporting this counterargument. Because plaintiffs have not supported this proposition with any legal authority, the argument is forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *Kic v. Bianucci*, 2011 IL App (1st) 100622, ¶ 23.

¶ 43 Even if the argument were not forfeited, it would nonetheless lack merit. As the Village concedes, plaintiffs *would* have been entitled to notice of any hearings concerning future amendments to the property's zoning regulations. *Passalino v. City of Zion*, 237 Ill. 2d 118, 124-25 (2010). Presumably, based on this fact, plaintiffs reason that such notice would enable them

to apply for and receive a liquor license prior to any zoning amendments becoming effective. However, as the Village suggests, this argument is grossly reductionist.

¶ 44     If the Village's B-3 zoning regulations were amended to preclude business owners from obtaining liquor licenses, the Village would be entitled to hold a hearing adopting the amendments as soon as 15 days from the date plaintiffs were provided such notice. 65 ILCS 5/11-13-14 (West 2020). Consequently, plaintiffs would have relatively little time to comply with any of the Village's or State's prerequisites before completing and filing its liquor license application.

¶ 45     On the other hand, if we follow the Village's interpretation of Exhibit C, plaintiffs would have up to 20 years from the date of the agreement's execution to complete these prerequisites and file its liquor license, regardless of the timing of any zoning amendments. 65 ILCS 5/11-15.1-4 (West 2020). That being the case, plaintiffs are incorrect in asserting that the Village's interpretation of the agreement renders any portion of Exhibit C meaningless.

¶ 46     For all of these reasons, we find that the trial court misinterpreted the clear and unambiguous language of the annexation agreement, particularly Exhibit C. Because the trial court's grant of specific performance and a writ of *mandamus* relied on its flawed interpretation, we also find that the trial court abused its discretion in awarding plaintiffs specific performance and erred in issuing its writ of *mandamus*.

¶ 47                                   III. CONCLUSION

¶ 48     For the reasons stated, we reverse the judgment of the circuit court of Lake County.

¶ 49     Reversed.